J. S59043/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: S.S.J.M., A/K/A S.M.H., A/K/A S.M.H., MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.B. | : : | |
| | : | No. 775 WDA 2015 |

Appeal from the Order Entered April 17, 2015
In the Court of Common Pleas of Allegheny County
Orphan's Court No(s).: TPR 187 of 2013

BEFORE: BOWES, DONOHUE, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED OCTOBER 15, 2015**

T.B. ("Father") appeals from the order entered April 17, 2015, in the Allegheny County Court of Common Pleas, which involuntarily terminated his parental rights to his minor daughter, S.S.J.M., also known as S.M.H. ("Child"), born in April of 2012.[1]  We affirm.

Child first came to the attention of the Allegheny County Office of Children, Youth and Families ("CYF") on June 7, 2012, when Mother filed for a Protection From Abuse ("PFA") order against Father.  N.T., 4/14/2015, at 10.  At that time, Mother did not identify Father as the father of Child.  *Id.* at 7.  Instead, Mother claimed that her boyfriend was Child's father.  *Id.*  On

---

[*] Former Justice specially assigned to the Superior Court.

[1] Child's mother, C.M. ("Mother"), executed a consent-to-adoption form on October 3, 2013.  The orphans' court later confirmed Mother's consent and terminated her parental rights.  Mother is not a party to the instant appeal.

August 21, 2012, Child was removed from Mother's care and placed in foster care. *Id.* at 6. Child was adjudicated dependent on September 6, 2012. *Id.* at 14.

In February of 2013, a paternity test revealed that Mother's boyfriend was not Child's father. *Id.* at 7. Mother initially refused to provide the identity of any other possible father. *Id.* However, after a "couple of months," Mother revealed that Father may be Child's father. *Id.* On June 14, 2013, CYF sent a letter to Father at the Allegheny County Jail, where he was incarcerated, and inquired about the possibility of his paternity. *Id.* at 16. Father was released from incarceration on August 30, 2013, and participated in a paternity test on October 30, 2013. *Id.* at 19-20. On November 17, 2013, Father was informed that he was, in fact, Child's father. *Id.* at 22.

On November 18, 2013, CYF filed a petition to terminate Father's parental rights to Child involuntarily. A termination hearing was held on April 14, 2015, and April 15, 2015, during which the orphans' court heard the testimony of CYF caseworker, Rhianna Diana; Allegheny County Drug Testing employee, Anthony Williams; psychologist, Neil Rosenblum; and Father. On April 17, 2015, the orphans' court entered its order terminating Father's parental rights. Father timely filed a notice of appeal on May 15, 2015, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Father now raises the following issues for our review.

> I. Whether the [orphans'] court committed reversible error in finding that [CYF] met [its] burden of proof and proved by clear and convincing evidence that the parental rights of [Father] should be terminated pursuant to 23 Pa[.]C.S.A. [§] 2511(a) (1), (2), (5), and (8)[?]
>
> II. Whether the [orphans'] court committed reversible error in finding that [CYF] met [its] burden of proof and proved by clear and convincing evidence that terminating the parental rights of [Father] best meets the needs and welfare of [Child] pursuant to 23 Pa[.]C.S.A. [§] 2511 (b)[?]

Father's Brief at 1.

Father argues that his initial failure to be involved in Child's life should not be held against him, because he was not aware that Child existed or that he is Child's Father. *Id.* at 6-8. Father further asserts that CYF failed to provide him with adequate reunification services and that CYF failed to present clear and convincing evidence that he did not complete his Family Service Plan ("FSP") objectives. *Id.* at 8-16. In addition, Father contends that it is in Child's best interest to maintain a relationship with him, and that terminating his parental rights would be "like a death sentence" to that relationship. *Id.* at 18.

We consider Father's claims mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial

court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384

(Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> *     *     *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> *     *     *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential

parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

During the termination hearing, CYF caseworker, Rhianna Diana, testified that Father has been convicted of various crimes, including simple assault, harassment, public drunkenness, and violation of open container laws. N.T., 4/14/2015 (part 1), at 32. Father has been incarcerated numerous times. *Id.* at 27-28. Father was incarcerated from April 20, 2007, to May 3, 2007; from December 21, 2007, to December 23, 2007; from July 21, 2009, to January 21, 2010; from July 7, 2010, to July 12, 2010; from July 29, 2011, to August 15, 2011; from September 25, 2011 to October 20, 2011; from January 20, 2013, to August 30, 2013; and from April 9, 2014, to June 4, 2014. *Id.*

In addition, Father has had a series of PFA orders entered against him. *Id.* at 52. One PFA petition was filed on August 1, 2007, by a woman named M.P., and a temporary PFA order was granted. *Id.* at 53-54; Ex. CYF 3. A woman named L.G. obtained a final PFA order dated April 26, 2007.

N.T., 4/14/2015 (part 1), at 56. A temporary PFA order dated May 9, 2011, was issued with respect to a woman named A.D. *Id.* at 58. A.D. later obtained a final PFA order dated April 28, 2014. *Id.* A woman named T.F. acquired a temporary PFA order against Father, dated January 9, 2012. *Id.*; Ex. CYF 3.

Ms. Diana further testified concerning Father's FSP objectives, which included achieving and maintaining recovering from substance abuse, improving his relationship with Child, preventing abuse or neglect of Child, providing and maintaining living conditions that are free from health and safety concerns, showing an understanding of age-appropriate behavior and expectations for Child, and stabilizing mental health problems. N.T., 4/14/2015 (part 2), at 28-29. With respect to substance abuse, CYF asked Father to participate in drug and alcohol evaluations. N.T., 4/14/2015 (part 1), at 38-39. Father did not comply, and reported that he could not obtain an evaluation because he lacked insurance, and because his application for insurance was denied. *Id.* at 40-41. Father also claimed that an evaluation would be a waste of time, because he no longer consumed alcohol or used drugs. *Id.* at 40. Ms. Diana explained that not having insurance should not have stopped Father from obtaining an evaluation, because there were services available that could provide an evaluation for free, or used a sliding pay scale. *Id.* at 41. Moreover, CYF was court-ordered to make sure Father's evaluation was paid for. N.T., 4/14/2015 (part 2), at 45.

Concerning Father's parenting, Ms. Diana testified that CYF referred Father to a parenting program. N.T., 4/14/2015 (part 1), at 48. Father completed five sessions of the program before being incarcerated. *Id.* At the time of the termination hearing, Father had not been able to find a parenting program that worked with his employment schedule. *Id.* Father also was asked to complete a domestic violence program. *Id.* at 59-60. Father was referred to a program, but completed only one class. *Id.* at 60; N.T., 4/14/2015 (part 2), at 33. With respect to mental health, CYF requested that Father address his anger management issues. N.T., 4/14/2015 (part 1), at 52. Father successfully completed an anger management program. *Id.* at 43, 59. Concerning Father's living conditions, Father reported being homeless upon being released from incarceration in August of 2013. *Id.* at 44. Father was using a drop-in center to receive mail, and did not report to CYF where he was staying. *Id.* at 44-45. Father finally obtained housing approximately two or three months prior to the termination hearing. *Id.* at 44. Ms. Diana visited Father's apartment, and it appeared to be appropriate. N.T., 4/14/2015 (part 2), at 42.

Finally, Ms. Diana testified concerning Father's visitation with Child. Father receives two supervised visits with Child per week, which began in January of 2014. *Id.* at 4-6. Father attended his visits with Child consistently, until January of 2015. *Id.* at 5. Since January 5, 2015, Father has failed to attend six of his visits. *Id.* Ms. Diana noted that she has only

seen Father and Child together for brief periods of time, but she did not have any concerns about Father's conduct. *Id.* at 6-7. There was one incident during September of 2014, during which Father was "rough" with Child. *Id.* at 35-36.

Mr. Anthony Williams testified that he is employed by Allegheny County Drug Testing. *Id.* at 19. Mr. Williams explained that Father failed to appear for seven of his sixteen scheduled drug tests. *Id.* at 21. In addition, Father tested positive on three occasions. *Id.* Father tested positive for THC on December 13, 2013, and November 21, 2014. *Id.* Father tested positive for cocaine on January 5, 2015. *Id.*

Father testified that he resided with a friend following his release from incarceration in August of 2013. N.T., 4/15/2015, at 44-45. Father claimed that it took him so long to find housing because he was looking for a residence that he could afford, and that was "surrounded . . . by playgrounds and stuff" for Child. *Id.* at 50. Father acknowledged that he missed several recent visits with Child, but stated that he was aware of only four missed visits, and that one of them was missed because he was sick. *Id.* at 57.

Concerning the rest of his FSP objectives, Father acknowledged that he did not complete his parenting program because he failed to pay restitution, and was incarcerated due to a probation violation. *Id.* at 51. Father alleged that he stopped attending his domestic violence program because the

program was charging him $25 per class. *Id.* at 52-53. Similarly, Father reported that he has not been able to afford a drug and alcohol evaluation, even on a sliding pay scale. *Id.* at 48. However, Father insisted that he is drug tested at his place of employment, and by his probation officer. *Id.* at 46-47.

Based on this testimony, the orphans' court found that Father has ongoing issues with drug use and anger management, and that Father has failed to make progress in addressing his FSP objectives. Orphans' Court Op., 6/2/2015, at 5. The court emphasized Father's "non-compliance with a drug and alcohol assessment, his only recent procurement of permanent housing, his recent positive testing for cocaine, his non-compliance for domestic violence classes and domestic violence history, and Father's failure to move toward unsupervised visits . . . ." *Id.*

After careful review, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to Child. Father has a lengthy history of criminal activity, and has had numerous PFA petitions filed against him. Moreover, Father has not made significant progress toward achieving reunification with Child since discovering that he is her father. Most notably, Father recently failed to appear for several visits with Child, and tested positive for cocaine. Thus, the evidence supports the conclusion of the orphans' court that Father is incapable of

parenting Child, and that Father will not, or cannot, remedy this parental incapacity.

Additionally, we reject Father's contention that CYF failed to make adequate reunification efforts. Our Supreme Court recently held that reasonable reunification efforts are not necessary to support an order terminating parental rights. We have discussed the Court's decision as follows.

> In **In re D.C.D.**, ___ Pa. ___, 105 A.3d 662 (Pa. 2014), our Supreme Court analyzed the language of Section 2511(a)(2) of the Adoption Act, as well as Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351. The Court reasoned that, while "reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child," neither of these provisions, when read together or individually, requires reasonable efforts. The Court also concluded that reasonable efforts were not required to protect a parent's constitutional right to the care, custody, and control of his or her child. . . .

**In re Adoption of C.J.P.**, 114 A.3d 1046, 1055 (Pa. Super. 2015) (some citations omitted). No relief is due.

We next consider whether the orphans' court abused its discretion by terminating Father's parental rights under Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the

- 11 -

> parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. ***Id***. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. ***Id***. at 63.

***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa. Super. 2010).

Psychologist, Neil Rosenblum, testified that he conducted a series of evaluations with respect to Father, Child, and Child's foster mother. N.T., 4/15/2015, at 4-6. Dr. Rosenblum preformed an interactional evaluation of Child and her foster mother on June 14, 2013; an interactional evaluation of Child and Father on January 13, 2014; an individual evaluation of Father on January 13, 2014; an interactional evaluation of Child and her foster mother on January 20, 2014; an interactional evaluation with Child and her foster mother on October 15, 2014; an interactional evaluation with Child and Father on October 15, 2014; an individual evaluation of Father on October 15, 2014; and an interactional evaluation of Child and her foster mother on March 11, 2015.[2] ***Id.*** at 5. Based on these evaluations, Dr. Rosenblum concluded that Child's foster mother is Child's "primary attachment figure and the most important anchor of her emotional growth and security." ***Id.*** at 9. Child and her foster mother share "an exceptionally close relationship,"

---

[2] Father failed to attend an evaluation scheduled for February 11, 2015. ***See*** Ex. CYF 5 (Dr. Rosenblum's evaluations).

and Child's foster mother displays excellent parenting skills. *Id.* at 8. Dr. Rosenblum stated that removing Child from her foster mother "would lead to a severe risk of major regression and emotional difficulty on her part." *Id.* at 22.

With respect to Father, Dr. Rosenblum testified that he handled his interactional evaluations with Child "pretty well," and that Father acted appropriately. *Id.* at 18-20. Child knows that Father is her father. *Id.* at 20. However, not surprisingly, there was no evidence of a strong attachment between Father and Child. *Id.* During the interactional evaluation in October of 2014, Child initially hid behind her foster mother, and did not want to go into the evaluation room with Father. *Id.* at 19. Child also refused to give Father a hug. *Id.* In addition, since the summer of 2014, Child has been exhibiting "concerning patterns of aggressive behavior, hitting, biting, having sleep difficulties, actually having nightmares, and being very difficult to console . . . ." *Id.* at 9. This behavior coincided with Father's release from incarceration in June of 2014, and the resumption of his visits with Child in July or August of 2014. *Id.* Dr. Rosenblum did not believe that Child would suffer any adverse effects if Father's parental rights were terminated, and opined that adoption by foster mother would be consistent with Child's needs and welfare. *Id.* at 20, 22. Nonetheless, Dr. Rosenblum indicated that it would be beneficial for Child to

maintain a relationship with Father, and suggested that an open adoption would be the best outcome. *Id.* at 33-34, 39.

The orphans' court found that Child has a strong bond with her foster mother, and that Child would not suffer any adverse effects if Father's parental rights are terminated. Orphans' Court Op., 6/2/2015, at 5. The court noted that Child has been in foster care for an extended period of time, and that Child is in need of a safe and stable home. *Id.*

We again discern no abuse of discretion. The record confirms that Child is bonded with her foster mother, who has cared for Child since she was about four months old, and that Child does not share a bond with Father. While Dr. Rosenblum opined that it would be beneficial for Child to maintain some type of relationship with Father, he also made it clear that Child's needs and welfare would best be served by allowing Child to be adopted. Father is not entitled to relief.

For the foregoing reasons, we affirm order of the orphans' court involuntarily terminating Father's parental rights to Child.

Order affirmed.

J.S59043/15

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  10/15/2015